LOCAL #1547, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, AFL–CIO, an unincorporated Labor Association, Plaintiff and Appellant,

v.

LOCAL #959, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS, INDEPENDENT, Defendant and Appellee,

National Labor Relations Board, Intervenor and Appellee.

Nos. 73–1644, 73–2647.

United States Court of Appeals, Ninth Circuit.

Nov. 18, 1974.

As Corrected Jan. 14, 1975.

Robert M. Goldberg (argued), Anchorage, Alaska, for plaintiff and appellant.

George H. Davies (argued), Vance, Davies & Roberts, Seattle, Wash., for defendant and appellee.

Before BROWNING, ELY and GOODWIN, Circuit Judges.

## OPINION

ALFRED T. GOODWIN, Circuit Judge:

This is an action upon a "no-raid" agreement between rival labor unions. The district court, in a proceeding under § 301 of the Labor-Management Relations Act, 29 U.S.C. § 185[1] denied both damages and injunctive relief, on the ground that enforcement of the no-raid agreement would conflict with a decision of the National Labor Relations Board.

Local 1547 of the International Brotherhood of Electrical Workers (IBEW) and Local 959 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America (Teamsters) agreed in 1968 that neither union would organize or represent employees "in any situation where an established collective-bargaining relationship exists with the other union".[2]

The IBEW was the recognized bargaining representative for approximately 250 employees of ITT Arctic Services, Inc. (White Alice Communications System). In 1972, the collective-bargaining agreement between IBEW and White Alice Communications was to expire. In anticipation of this expiration, the Teamsters filed a petition under § 9 of the National Labor Relations Act, 29 U.S.C. § 159, with the NLRB for certification as the representative of the White Alice employees. The IBEW intervened

1. 29 U.S.C. § 185(a) provides:

"Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties."

2. The "no-raiding" agreement between IBEW and the Teamsters provided:

"The International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (and its affiliates), hereinafter referred to as the IBT, and the International Brotherhood of Electrical Workers, hereinafter referred to as the IBEW, in order to promote harmonious relations and achieve the fullest cooperation between the IBT and the IBEW and to encourage mutual aid and assistance and to resolve amicably any disagreements which may exist between the two unions, hereby agree as follows:

1. Each union agrees to refrain from organizing or representing employees in any situation where an established collective bargaining relationship exists involving the other union. For the purpose of this provision, the term 'established collective bargaining relationship' means any situation in which either union (a) has been recognized by the employer as the collective bargaining representative of the employees involved, or (b) has been certified by the National Labor Relations Board or other federal, state or provincial agency as the collective bargaining agent of the employees.

2. Each union further agrees to refrain from intervening or interfering in any organizing or election campaign undertaken by the other union in a previously unorganized unit, or a unit represented by a union not a party to this agreement.

3. If any dispute over the implementation of this agreement shall arise at the local union level, settlement shall first be sought between the District Vice President of the IBEW and the Area Conference Director of the IBT. Upon their failure to reach agreement, the dispute shall be settled by the International Presidents of both unions or their designated representatives.

4. Either union may terminate this agreement by giving the other union six months' notice in writing.

"Executed in Washington, D.C. this 21st day of October, 1968."

in the resulting hearing before a hearing officer, emphasized the no-raid agreement, and argued that the NLRB should defer its election in order to give effect to the contract between IBEW and the Teamsters.

The Regional Director, however, issued a direction of election. The IBEW failed to request review by the full NLRB of the Regional Director's decision. The ballots were mailed to the White Alice employees, and they voted in favor of the Teamsters.

Meanwhile, IBEW brought this action in the district court. IBEW demanded a temporary injunction restraining the Teamsters from further election activity, a permanent injunction requiring the Teamsters to withdraw their representation petition from the NLRB, and an award of damages for the alleged breach of the no-raid agreement.

The NLRB intervened in the litigation. The court granted the temporary injunctive relief and ordered the NLRB to refrain from tabulating or publishing the election results.

The NLRB filed motions to dismiss and for summary judgment contending that the district court was not authorized by § 301 to nullify a board determination made in the exercise of its statutory authority. Specifically, the NLRB argued that the district court lacked jurisdiction in a private, collateral § 301 action, to review a board determination on representation.

In due course, the district court ruled that, because the IBEW had failed to appeal the Regional Director's decision to the full Board, the district court was without jurisdiction to hear the specific enforcement claim. 356 F.Supp. 636 (D.Alaska 1973). In addition to dismissing the specific enforcement portion of the IBEW complaint, the district court also vacated its temporary restraining order. The court later granted the NLRB motion for summary judgment, in a decision published in 361 F. Supp. 1006 (D.Alaska 1973).

I

## FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES

IBEW argues that the NLRB's refusal to honor the "no-raiding" agreement was a departure from its settled, routine practice and was an illegal, invidious discrimination against the IBEW. For reasons discussed below, we need not consider the contention that the NLRB acted arbitrarily.

As noted, IBEW failed to appeal the Regional Director's direction of election to the full Board. The NLRB's Rules and Regulations, at 29 C.F.R. § 102.67, provide in part:

"(b) * * * The decision of the regional director shall be final: *Provided, however*, That within 10 days after service thereof any party may file eight copies of a request for review with the Board in Washington, D.C. * * *."

Under § 102.67, unexplained failure to exhaust available administrative remedies is ordinarily a bar to judicial review of agency action. *See* United States v. Tucker Truck Lines, 344 U.S. 33, 73 S.Ct. 67, 97 L.Ed. 54 (1952).[3]

3. The court set out a frequently quoted rationale of the doctrine of exhaustion, in the following language:

"* * * [O]rderly procedure and good administration require that objections to the proceedings of an administrative agency be made while it has opportunity for correction in order to raise issues reviewable by the courts. It is urged in this case that the [Interstate Commerce] Commission had a predetermined policy on this subject which would have required it to overrule the objection if made. While this may well be true, the Commission is obliged to deal with a large number of like cases. Repetition of the objection in them might lead to a change of policy, or, if it did not, the Commission would at least be put on notice of the accumulating risk of wholesale reversals being incurred by its persistence. Simple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has

■ 29 C.F.R. § 102.67 is explicit. The decision of the Regional Director may be appealed to the full Board. Whether or not the full Board might have routinely affirmed the Regional Director, the rationale of *Tucker Truck Lines* requires that IBEW seek review by the full NLRB. There is nothing about this labor representation case which requires us to assume jurisdiction and review the Regional Director's decision under IBEW's theory that some of our selective-service cases, which were criminal prosecutions, have repealed the doctrine of exhaustion.[4]

IBEW argues that Leedom v. Kyne, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 10 (1958), grants jurisdiction despite the failure to exhaust. *Leedom* involved the Regional Director's inclusion of nonprofessional employees in a mixed unit of professional and nonprofessional employees without the consent of the professional employees. The Board did not deny that 29 U.S.C. § 159(b)(1) had been violated. In finding that an otherwise nonreviewable decision was made reviewable by unlawful Board action, the Supreme Court in Leedom v. Kyne reasoned:

" * * * This suit is not one to 'review', * * * a decision of the Board made within its jurisdiction. Rather is it one to strike down an order of the Board made in excess of its delegated powers and contrary to a specific prohibition in the Act * * *." 358 U.S. at 188, 79 S.Ct. at 184.

■ IBEW contends that the Regional Director's failure to defer to voluntary enforcement of the no-raid agreement constitutes action so patently discriminatory as to provide the firmest possible support for judicial intervention under *Leedom*. IBEW misapprehends *Leedom*. In the Regional Director's refusal to defer the White Alice election to IBEW's no-raid agreement, he violated

neither statutes nor regulations. He simply ruled in a manner that did not satisfy one of the parties. This is not an unusual state of affairs.

The Supreme Court in Boire v. Greyhound Corp., 376 U.S. 473, 84 S.Ct. 894, 11 L.Ed.2d 849 (1964), limited *Leedom* to violations of statutory guidelines, and refused to extend it to possible abuses of discretion.

It is evident that IBEW did not exhaust its administrative remedies. IBEW has cited no authority which confers upon the district court jurisdiction to review the Regional Director's decision. Thus, we express no opinion as to the propriety of the Director's decision to hold the election in the face of the no-raid agreement.

## II

## SPECIFIC–ENFORCEMENT JURISDICTION

The specific enforceability of a no-raid agreement appears to be a question of first impression in this circuit. The competing interests which must be balanced are these: Commerce depends upon parties honoring their obligations. National labor policy is committed to employee rights recognized in § 7 of the NLRA, 29 U.S.C.A. § 157:

" * * * to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection * * *."

In IBEW's case, deference by the Regional Director to the no-raid agreement could have limited the § 7 rights of White Alice employees. The agreement theoretically could have deprived a majority of the workmen of their right to "bargain collectively through representatives of their own choosing". At least,

erred against objection made at the time appropriate under its practice." 344 U.S. at 37, 73 S.Ct. at 69.

4. *See, e. g.*, Donato v. United States, 302 F. 2d 468, 470 (9th Cir. 1962).

this is a decision the Regional Director is entitled to make. The Regional Director's finding that a question of representation existed and his subsequent direction of election indicate that IBEW may not have been the favored bargaining agent of all White Alice employees.[5] The choosing of a new, favored bargaining agent through a § 9 election would have been frustrated by specific enforcement of the no-raid agreement.

The Seventh Circuit Court of Appeals, exercising jurisdiction under § 301, allowed specific enforcement of a no-raid agreement. United Textile Workers v. Textile Workers Union, 258 F.2d 743 (7th Cir. 1958). IBEW urges us to do likewise.

One of our district courts has taken the other view. International Union of Doll and Toy Workers v. Metal Polishers Union, 180 F.Supp. 280 (S.D.Cal.1960). Judge Mathes's opinion recognized the inherent conflict between the § 301 grant of district court jurisdiction and that portion of the National Labor Relations Act, 29 U.S.C. §§ 159(b), (c),[6] granting jurisdiction to the National Labor Relations Board to hear questions pertaining to representation.

In *Doll and Toy Workers,* the raiding union and the Regional Director of the NLRB moved for dismissal, asserting that the district court lacked subject-matter jurisdiction. The incumbent union, citing *Textile Workers* and § 301, urged the district court to accept jurisdiction. Judge Mathes, emphasizing the broad judicial construction of the grant of power given the NLRB in the National Labor Relations Act (see cases cited

---

5. *See* 29 C.F.R. § 101.18(a).

6. 29 U.S.C. § 159 provides:

"* * *

"(b) The Board shall decide in each case whether, in order to assure to employees the fullest freedom in exercising the rights guaranteed by this subchapter, the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof: *Provided,* That the Board shall not (1) decide that any unit is appropriate for such purposes if such unit includes both professional employees and employees who are not professional employees unless a majority of such professional employees vote for inclusion in such unit; or (2) decide that any craft unit is inappropriate for such purposes on the ground that a different unit has been established by a prior Board determination, unless a majority of the employees in the proposed craft unit vote against separate representation or (3) decide that any unit is appropriate for such purposes if it includes, together with other employees, any individual employed as a guard to enforce against employees and other persons rules to protect property of the employer or to protect the safety of persons on the employer's premises; but no labor organization shall be certified as the representative of employees in a bargaining unit of guards if such organization admits to membership, or is affiliated directly or indirectly with an organization which admits to membership, employees other than guards.

"(c)(1) Whenever a petition shall have been filed, in accordance with such regulations as may be prescribed by the Board—

(A) by an employee or group of employees or any individual or labor organization acting in their behalf alleging that a substantial number of employees (i) wish to be represented for collective bargaining and that their employer declines to recognize their representative as the representative defined in subsection (a) of this section, or (ii) assert that the individual or labor organization, which has been certified or is being currently recognized by their employer as the bargaining representative, is no longer a representative as defined in subsection (a) of this section; or

(B) by an employer, alleging that one or more individuals or labor organizations have presented to him a claim to be recognized as the representative defined in subsection (a) of this section;

the Board shall investigate such petition and if it has reasonable cause to believe that a question of representation affecting commerce exists shall provide for an appropriate hearing upon due notice. Such hearing may be conducted by an officer or employee of the regional office, who shall not make any recommendations with respect thereto. If the Board finds upon the record of such hearing that such a question of representation exists, it shall direct an election by secret ballot and shall certify the results thereof.

"* * * *."

at 180 F.Supp. 284), took note of the overlap of jurisdiction between the district court (LMRA § 301, 29 U.S.C. § 185) and the NLRB (NLRA §§ 7, 9, 10, 29 U.S.C. §§ 157, 159, 160). He concluded that the preferred policy was to confer representation-dispute jurisdiction upon a single tribunal. Faced with two statutes, one appearing on its face to grant jurisdiction to the district court and the other to the NLRB, Judge Mathes concluded that the NLRB should be awarded exclusive representation jurisdiction.

"  *  *  *   [T]here can be little doubt that the Congress expressly empowered an administrative agency to deal with disputes as to employee representation, because such matters invariably concern more than the interests of the litigants themselves. The interests of the public, of the industries affected, of the unions affected, as well as the individual employees' right to choose freely their bargaining representatives, all must be considered. An administrative agency, with its flexible procedures, is obviously better able to evaluate all these competing interests, and to determine as well the permissibility of non-raiding agreements in this area, than is a court  *  *  *.   [Citation omitted.]

"While my great respect for the learning and acumen of the distinguished Court of Appeals for the Seventh Circuit naturally gives me pause in differing with United Textile Workers of America, A.F.L.–C.I.O. v. Textile Workers Union, supra, the considerations discussed nonetheless impel for me the conclusion that effectuation of the policy of the National Labor Relations Act, in specifically granting jurisdiction to the National Labor Relations Board over represen-

tational disputes, restricts ex necessitate the literal meaning of the language in § 301(a) of the Taft-Hartley Act conferring jurisdiction upon the District courts to enforce agreements 'between any such labor organizations.'  *  *  *   [Citation omitted.]

"The same considerations impel the further conclusion that the non-raiding agreement between plaintiff and defendant unions in this case cannot be permitted to circumvent the policy of the National Labor Relations Act by ousting or limiting the jurisdiction of the Board  *  *  *.   [Citations omitted.]"   180 F.Supp. at 286.

■ We agree that the district court lacked jurisdiction to grant specific enforcement of the no-raid agreement after the NLRB had ordered an election. The superior authority of the Board in representation matters, combined with the paramount employee right of free choice under § 7, requires the district court to defer to Board action. We do not hold that a no-raid agreement is never enforceable by a district court in a § 301 proceeding. However, when such enforcement conflicts with valid action taken by the Board, the latter must prevail.[7]

Our holding that the district court lacked jurisdiction to grant specific enforcement of the no-raid agreement is consistent with, if not controlled by, the Supreme Court's recent decision in NLRB v. Magnavox Co., 415 U.S. 322, 94 S.Ct. 1099, 39 L.Ed.2d 358 (1974). *Magnavox* involved a collective-bargaining agreement which, in effect, restricted employee on-premises distribution of literature. The Supreme Court held that a bargaining representative cannot contractually waive the workmen's § 7 right to free choice of bargaining representatives. Similarly, the no-raid agree-

7. *See* NLRB v. Weyerhaeuser Co., 276 F.2d 865 (7th Cir.), cert. denied, 364 U.S. 879, 81 S.Ct. 168, 5 L.Ed.2d 102 (1960). *Cf.* Boire v. Teamsters Union, 479 F.2d 778, 803 (5th Cir. 1973), where the court stated:

"  *  *  *   The parties cannot by contractual agreement divest the Board's

function to operate in the public interest, and this is so regardless of whether the contractual agreement is reached by consent or through an arbitrator's construction  *  *  *."

ment entered into by IBEW cannot be allowed to restrict the White Alice employees' § 7 rights.

## III

## IBEW'S DEMAND FOR DAMAGES

The district court held that the incumbent IBEW could not recover damages for the Teamsters' alleged breach of the no-raid agreement.

In denying damages, the district court placed great weight upon language the Supreme Court had employed in another context when it ordered arbitration:

"Should the Board disagree with the arbiter, by ruling, for example, that the employees involved in the controversy are members of one bargaining unit or another, the Board's ruling would, of course, take precedence; and if the employer's action had been in accord with that ruling, it would not be liable for damages under § 301 * * *." Carey v. Westinghouse Electric Corp., 375 U.S. 261, 272, 84 S.Ct. 401, 409, 11 L.Ed.2d 320 (1964).

The language "and if the employer's action had been in accord with that ruling, it would not be liable for damages under § 301" is dictum in the Carey context. The Supreme Court has not applied this language to a breach of a no-raid agreement. And we would be unwarranted in predicting that the Supreme Court would categorically deny damages if it were faced with a damage question like the one before this court.

Carey involved a jurisdictional dispute between two unions, with an employer in the middle. Carey established that the NLRB, and not an arbitrator, is the final authority on the designation of bargaining units for the various employees. Thus, if the employer had bargained with a unit which ultimately prevailed before the Board, no damages would lie in a § 301 action. This result is analo-

gous to the enforcement of any contract. If A and B enter into a contract, and litigation results from an alleged breach, the trial court (or the arbitrator) may find in favor of A. The appellate court (or the NLRB) may in due course find in favor of B. A does not, by winning the first decision, become entitled to damages. The Carey case precludes the award of damages against an employer who is in compliance with the NLRB determination, even though the employer may have refused to bargain with the union that "won" the antecedent arbitration. The primacy of the NLRB's decision supersedes any damage award made by an arbitrator, just as an appellate-court decision reversing a trial-court judgment supersedes that judgment.

■ The factual and policy considerations concerning a no-raid agreement present a different set of problems. Where a collective-bargaining contract has only one enforceable standard, a no-raid agreement may have two. When specific enforcement is demanded, and the no-raid agreement conflicts with an NLRB decision, the district court lacks jurisdiction to enforce the agreement, because such enforcement would frustrate § 7 rights. The real parties in interest are the employees. Treaties between two unions cannot override the § 7 rights of workmen to select their own bargaining representatives. However, when considering the remedy of damages, the contracting parties, the unions, are the real parties in interest.

■ We do not wish to establish a precedent which renders worthless all written no-raid agreements, historically important to labor-relations stability. There may be cases in which bad faith or predatory organizing practices are so patently offensive to the orderly resolution of interunion competition that recourse to damages should be available as a contractual remedy. On the other hand, if the "raid" occurs at the invitation of the raided union's members, an award of damages may well have a chill-

ing effect on protected § 7 activities, and would thus be inappropriate. The facts in each case should control.

The propriety of a damage award for a breach of a no-raid agreement requires the kind of factual determination that can best be made after a trial. The decision ought to be reached by balancing the conduct of the parties against their agreement. This standard is not offensive to the *Magnovox* doctrine. If the "raid" is not motivated by the members of the raided union, but takes place because of an intentional breach of the contract by the raiding union, an award of damages against the predatory union would not interfere with anyone's § 7 rights. The raided union members would presumably have enjoyed their rights, and the raiding union, in paying damages, would be receiving the treatment predictably accorded those who breach their contracts. An interunion contract, even though unheeded by the NLRB, need not be deemed a worthless scrap of paper between the two signatory parties when only their rights are involved.

We conclude that it is one thing to deny specific enforcement when the agency charged with supervision of union elections has determined that the best interests of union democracy will be served by an election, and it is quite another to say that even the most outrageous predations by one union upon another can be carried out without fear of any retribution.

Accordingly, we vacate the summary judgment entered below insofar as it denied IBEW an opportunity to attempt to prove a claim for damages. We express no opinion upon the ultimate liability of the Teamsters for damages in this case, as the facts have not yet been developed by trial or stipulation. All other parts of the district court judgment are affirmed.

Affirmed in part; vacated and remanded in part.